UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**HONORE N. ESTES**                                      **CIVIL ACTION**

**VERSUS**                                               **NO. 19-2289**

**FREDERICK BOUTTÉ**                                     **SECTION: "B"(3)**

### REPORT AND RECOMMENDATION

Petitioner, Honore N. Estes, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On March 23, 2013, petitioner was convicted of second degree murder under Louisiana law.[1] On May 7, 2013, she was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[2] On February 25, 2015, her conviction and sentence were affirmed by the Louisiana Fifth Circuit Court of Appeal.[3] The Louisiana Supreme Court then denied her related writ application on February 5, 2016.[4]

On February 3, 2017, petitioner, through counsel, filed an application for post-conviction relief with the state district court.[5] That application was denied on June 21, 2017.[6] Her related

---

[1] State Rec., Vol. 7 of 8, transcript of March 22, 2013, p. 178; State Rec., Vol. 1 of 8, minute entry dated March 22, 2013; State Rec., Vol. 1 of 8, jury verdict form. The verdict was returned at 12:21 a.m. on March 23, 2013.
[2] State Rec., Vol. 7 of 8, transcript of May 7, 2013; State Rec., Vol. 1 of 8, minute entry dated May 7, 2013.
[3] State v. Estes, 168 So. 3d 847 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 8.
[4] State ex rel. Estes v. State, 186 So. 3d 1164 (La. 2016); State Rec., Vol. 8 of 8.
[5] State Rec., Vol. 2 of 8.
[6] State Rec., Vol. 3 of 8, Order dated June 21, 2017.

writ applications were likewise denied by the Louisiana Fifth Circuit Court of Appeal on August 31, 2017,[7] and the Louisiana Supreme Court on January 14, 2019.[8]

Petitioner then filed the instant federal application seeking habeas corpus relief on March 3, 2019.[9] The state filed a response arguing that the application should be dismissed as untimely.[10] The state is correct.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring her § 2254 claims within one (1) year of the date on which her underlying state criminal judgment became "final." 28 U.S.C. § 2244(d)(1)(A).[11] With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. However, if the defendant stops the appeal process before that point … the conviction becomes final when the time for seeking further direct review in the state court expires.
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or

---

[7] State v. Estes, No. 17-KH-448 (La. App. 5th Cir. Aug. 31, 2017); State Rec., Vol. 3 of 8.
[8] State v. Estes, 260 So. 3d 1209 (La. 2019); State Rec., Vol. 3 of 8.
[9] Rec. Doc. 3. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner has declared under penalty of perjury that her application was placed in the prison mailing system on March 3, 2019. Rec. Doc. 3, p. 15.
[10] Rec. Doc. 10.
[11] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

> after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (citations, quotation marks, and brackets omitted).

Here, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's conviction and sentence on February 25, 2015,[12] and mailed notice of its judgment on that same date.[13] Therefore, pursuant to Louisiana Supreme Court Rule X, § 5(a), petitioner had only until March 27, 2015, to seek further direct review. She did not file a writ application with the Louisiana Supreme Court by that date, and, although she subsequently filed a *pro se* writ application with that court, the Court finds that application was untimely for the following reasons.

When determining the filing date of a Louisiana state court filing by a *pro se* prisoner, federal habeas courts must apply Louisiana's "mailbox rule." Therefore, such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). However, for the reasons explained below, that rule does not aid petitioner in the instant case.

Because the date a prisoner placed a document in the prison mail system is rarely evident from the record, courts normally employ a rebuttable presumption that a document was "filed" in that manner on the date it was signed. See United States v. Minor, 582 F. App'x 315, 316 (5th Cir. 2014); Crochet v. Goodwin, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); Thornton v. Terrell, Civ. Action No. 09-1631, 2009 WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009). Here, the record in the instant case shows that the "Writ Application

---

[12] State v. Estes, 168 So. 3d 847 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 8.
[13] State Rec., Vol. 7 of 8, Notice of Judgment and Certificate of Delivery.

3

Filing Sheet" accompanying petitioner's writ application was signed by her on March 30, 2015, three days *after* the filing deadline expired.[14] Of course, if there is *other* evidence establishing the *actual* date a document was placed in the prison mailing system, the foregoing general presumption does not apply. See, e.g., Pierre v. Cain, Civ. Action No. 15-5252, 2019 WL 3779675, at *4 (E.D. La. Aug. 12, 2019) ("Courts may only presume an inmate's signature date to be the date of presentation when there is no other proof of when the pleadings were presented for mailing."). However, petitioner has presented no such evidence in this case. On the contrary, the record reflects that she herself has acknowledged that her application was mailed to the Louisiana Supreme Court on March 30, 2015.[15]

In addition, out of an abundance of caution, this Court notes that that is no evidence that petitioner was granted an extension of time to file her application, and, in fact, the Louisiana Supreme Court's own rules provide that extensions of the filing deadline are not available. Louisiana Supreme Court Rule X, § 5(a) ("No extension of time therefor will be granted."); see also Butler v. Cain, 533 F.3d 314, 319 (5th Cir. 2008). Lastly, the Court also notes that it is immaterial that the Louisiana Supreme Court simply stated that petitioner's writ application was "Denied" without specifying reasons or expressly stating that the application was untimely. Butler, 533 F.3d at 318-20.

For all of the foregoing reasons, this Court finds that petitioner's Louisiana Supreme Court writ application was filed no earlier than March 30, 2015, and it was therefore untimely. Accordingly, her federal limitations period commenced on the date her deadline for seeking timely

---

[14] State Rec., Vol. 8 of 8, Writ Application Filing Sheet.
[15] State Rec, Vol. 2 of 8, letter from petitioner to Jon Gegenheimer dated March 30, 2015.

direct review expired, i.e. March 27, 2015. That federal limitations period then expired one year later on March 28, 2016,[16] unless the deadline was tolled.

The Court first considers statutory tolling. The AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Here, four applications related to petitioner's conviction were pending before the state courts during the applicable one-year period ending on March 28, 2016. That said, none of those applications were ones seeking "post-conviction or other collateral review" so as to toll the limitations period for the following reasons.

As already noted, petitioner's untimely Louisiana Supreme Court writ application was pending during that period. However, because that application indisputably sought further *direct* review, it did not toll the federal limitations period. "Filings that are not part of *habeas or post-conviction proceedings* do not invoke Section 2244(d)(2) tolling." Butler v. Cain, 533 F.3d 314, 320 (5th Cir. 2008) (emphasis added).

In addition, in March of 2015, petitioner filed with the state district court a "Notice of Intention to Apply for Supervisory and/or Remedial Writs of Mandamus, Prohibition, and Certiorari" asking that court to set a "return date" for the filing of a Louisiana Supreme Court writ application.[17] On April 15, 2015, the district court denied that motion, noting that it had "no authority to grant or deny such a return date for a writ seeking review with the Louisiana Supreme

---

[16] Because the three hundred sixty-fifth day of the limitations period fell on a Sunday, petitioner's deadline was extended through the following Monday, March 28, 2016. See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed. R. Civ. P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).
[17] State Rec., Vol. 2 of 8.

Court."[18] Not only was that motion improper under state law, but, again, it was indisputably filed as part of petitioner's efforts to seek further *direct* review. Therefore, it likewise did not trigger § 2244(d)(2) tolling under the same Butler analysis.

Lastly, a "Motion to Release Personal Property" and a "Motion by Owner for Returned of Seized Property" were filed with the state district court in April of 2015 and March of 2016 asking that court to release the purse, its contents, a gun, and money seized in connection with petitioner's arrest. However, § 2244(d)(2) tolling is limited to applications that seek "'*review*' of the *judgment* pursuant to which [the petitioner] is incarcerated." Moore v. Cain, 298 F.3d 361, 366-67 (5th Cir. 2002) (emphasis added) (holding that a mandamus application seeking merely "an order directing the trial court to perform its duty" did not toll the AEDPA's statute of limitations). Therefore, motions seeking only the return of seized property do not qualify. See, e.g., Frazier v. Keith, Civ. Action No. 14-cv-2422, 2017 WL 4020436, at *1 (W.D. La. Mar. 17, 2017), adopted, 2017 WL 4019436 (W.D. La. Sept. 11, 2017).

Because the foregoing filings did not toll the limitations period, and because petitioner had no other applications pending before the state courts at any time on or before March 28, 2016, she clearly is not entitled to statutory tolling.[19]

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v.

---

[18] State Rec., Vol. 2 of 8, Order dated April 15, 2015.

[19] Although petitioner subsequently filed a state application for post-conviction relief on February 3, 2017, the federal limitations period had already expired by that date. Pleadings filed after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put: once the federal limitations period has expired, "[t]here [i]s nothing to toll." Butler, 533 F.3d at 318.

Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases …." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence whatsoever demonstrating that she is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.[20]

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?

---

[20] Out of an abundance of caution, the Court expressly notes that, as evidenced by her filing of the aforementioned motion requesting that the state district court set a return date for the filing of a Louisiana Supreme Court writ application, petitioner may have initially been confused as to the proper method for filing such a writ application. Nevertheless, even if so, it is clear that a prisoner's *pro se* status, lack of legal training, and mere ignorance of the law do not constitute rare and exceptional circumstances warranting equitable tolling. See, e.g., Felder v. Johnson, 204 F.3d 168, 171-72 (5th Cir. 2000); accord Gonzales v. Wilkinson, 269 F. App'x 481, 486 (5th Cir. 2008).

> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

Petitioner has not invoked Perkins. However, in the event she does so in any objections to this Report and Recommendation, the undersigned finds that she has not made the showing required under Perkins for the following reasons.

Here, petitioner was convicted of second degree murder. Louisiana law defines that offense as, *inter alia*, "the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. Ann. § 14:30.1(A)(1). "Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act. Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant." State v. Golson, 658 So. 2d 225, 230 (La. App. 2d Cir. 1995) (citations omitted). "Specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range." State v. Harris, 859 So. 2d 690, 693 (La. App. 4th Cir. 2003); accord Robinson v. Cain, Civ. Action No. 07-3651, 2010 WL 3170257, at *10 (E.D. La. Mar. 19, 2010), adopted, 2010 WL 3170081 (E.D. La. Aug. 6, 2010).

In assessing a petitioner's claim of actual innocence, a court normally first examines the evidence presented at trial and on which the conviction was based. See, e.g., Johnson v. Cain, Civ.

8

Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).  In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

> Julie Jensen testified that on March 4, 2012, she lived on Daffodil Lane.[FN 2]  On that date, her children informed her about an argument that was taking place down the street.  A short time later, Jensen's children returned and told her the people who were arguing had a gun, at which time Jensen went out to her front porch.  She witnessed an African American couple approximately three houses over.  The woman in the driveway had her hands on the top of a car, and Jensen could see that the woman had a gun in her hand.  The man, who was sitting, had the passenger side door of a car open.  Jensen saw the woman walk from behind one car and in between two cars, while waving a gun up and down.  Jensen heard a gunshot, and then saw the woman go to the ground while yelling at the man to get up; however, the man did not respond.  The woman ran inside then came back out again and yelled at the man to "get up."  At that point, Jensen called 9-1-1 and reported the shooting.  Jensen also told her neighbor, Joyce Moore, about what she had seen.  Jensen testified that she did not see an altercation between the woman and the man, or a struggle for a purse or gun prior to the shooting.  The man was standing still while the woman waived the gun.  Jensen had never met defendant or the victim.
>
>> [FN 2]  While Jensen did not identify the street as Daffodil Lane, the full name of the street was disclosed later in the record.  The record also indicates that this street is located in the Waggaman area of Jefferson Parish.
>
> On cross-examination, Jensen stated that one of the cars blocked her view of the argument from the waist down, and she did not know whether someone else's hand may have been on the gun.  Jensen further testified that defendant did not stand in a "firing position" at the time of the shooting.
> Joyce Moore testified that on March 4, 2012, she lived at 121 Daffodil Lane and was acquainted with defendant as a neighbor.[FN 3]  On that date, Moore was leaving her home when she was informed by Julie Jensen about what had happened to the victim, Nicholas Houston.  Moore immediately crossed the street to defendant's home, where she found defendant on the phone with 9-1-1.  Defendant told Moore that "it was an accident" and that the gun had gone off while defendant and Houston were arguing.  Moore observed Houston's body between two cars in the driveway.  After defendant had been put into the police car, Moore went into defendant's home to be with defendant's two children.
>
>> [FN 3]  Moore identified defendant in open court.

9

On cross-examination, Moore said that she did not hear any yelling outside prior to the time that she left her home on the date of the shooting. Moore testified that defendant told her that Houston had grabbed or pulled her, and Moore noted that it looked like a part of defendant's shirt had been ripped. Defendant also appeared to be upset.

Ten witnesses,[FN 4] all of whom were minors at the time of trial, provided consistent testimony regarding the shooting, with little varying detail. In summary, these witnesses observed defendant and Houston engaged in a verbal argument in the driveway. At no time did Houston become physically violent with defendant. Defendant went to her trunk and retrieved a gun, which she then pointed up and down at Houston while they stood approximately seven feet apart in the driveway between the two parked cars. Houston unsuccessfully attempted to get the gun from defendant. Defendant then shot Houston, and immediately thereafter got down on the ground with him, apparently in an attempt to revive him.

> [FN 4] These witnesses were: Hailey Jensen, Hannah Jensen, Jaimari Fleming, Jeanika Fleming, Jenai Green, Jeanara Fleming, Keira Kimbrough, Sanii Payne, Jimyria Payne and Jimmae Payne.

Deputy Scott Bradley testified that he was a patrol deputy for the Jefferson Parish Sheriff's Office 3rd District. He received a call for service at 116 Daffodil Lane on March 4, 2012, in response to a shooting. Upon arriving, Deputy Bradley observed a black male lying between two parked cars in the driveway, and defendant[FN 5] was exiting the house. Deputy Bradley approached defendant, and he asked her what had happened. Defendant's response was that "she did it." Deputy Bradley then searched defendant and placed her in the back of his police unit; defendant was not handcuffed at that time. When asked where the gun was, defendant told Deputy Bradley that it was inside of her purse. The gun was, in fact, located in defendant's purse, which was on the roof of one of the vehicles parked in the driveway. When asked what had happened with respect to the shooting, defendant told Deputy Bradley that she and the victim were arguing over items of clothing "when she swung her purse, and the gun went off." Deputy Bradley secured the scene until Sergeant Fernandez and Deputies Berthelot and Porche arrived. On cross-examination, Deputy Bradley said that defendant did not try to flee the scene of the shooting.

> [FN 5] Deputy Bradley identified defendant in open court.

Sergeant Randall Fernandez testified that he was a sergeant assigned to the 4th district patrol division of the Jefferson Parish Sheriff's Office, but was a homicide detective on March 4, 2012. After receiving a call for assistance on that date, Sergeant Fernandez proceeded to 116 Daffodil. Upon arrival, he noted the crime scene tape had been placed, and Houston's body was in the driveway between two cars. Sergeant Fernandez was informed by the other deputies that there were

10

witnesses in the area. He looked at the purse, but did not touch or manually manipulate it. Sergeant Fernandez observed a Glock pistol inside. Following this, he took measurements and photographs of the crime scene. Among the photographs taken was an image of the fired cartridge case of the round that fatally struck Houston. Other photographs included blood spatter on the door of the BMW, defendant's purse, which was on the hood of the BMW, and the Glock pistol which was in the purse with the grip pointing upward.

On cross-examination, Sergeant Fernandez testified that no tests for gunshot residue were conducted of defendant's hands or Houston's hands, because the practice had previously been discontinued by the department. The blood spatter at the scene was on the lower part of the BMW's driver door.

Deputy Brett Beavers testified that he worked for the Jefferson Parish Sheriff's Office and was assigned to the First District Patrol Division. On March 4, 2012, he was a detective assigned to the homicide division when he investigated defendant in relation to an incident at 116 Daffodil. After receiving a call that someone had been shot, Deputy Beavers responded to the scene, where other police personnel were already present. He began notifying his supervisors of the crime, and spent approximately thirty to forty-five minutes on the scene. While back at the detective bureau, Deputy Beavers received phone calls that witnesses to the crime had been located and that several statements were going to be taken. These witnesses included the Green/Fleming children, the Jensen family, Joyce Moore and the Payne family. After obtaining information regarding the witnesses, Deputy Beavers met with defendant.

Defendant agreed to speak with Deputy Beavers, at which time a Jefferson Parish Rights of Arrestee or Suspects Form was reviewed with defendant. Defendant placed her initials next to every right she was provided with, indicating that she understood and waived it. Among those rights explained to her was the right to have an attorney present during questioning. During the "pre-interview," defendant disclosed that she was married to the victim but had recently separated from him and acquired another residence in New Orleans. On the date of the incident, she was dropping off her young child so that the victim could watch him during her night shift. While at the home, she and the victim began to argue about "possible infidelity." Defendant claimed that the victim followed her outside when she tried to leave and took the keys to her vehicle. The two then went back inside where more arguing, as well as some pushing and shoving, took place. When defendant left the home and ran to a nearby corner stop sign, the victim told her that she did not have to leave. It was decided that defendant and the victim would switch cars and, at that time, the victim and defendant began removing items from the respective vehicles they had been driving. The victim told defendant that she could not have a purse that she pulled from the car. Defendant had also retrieved a handgun from the trunk that had been placed there earlier that day by a friend. Defendant stated that a "tug-of-war" ensued when the victim grabbed the purse. The whole time, defendant was holding a weapon in her right hand while her left hand was on the purse. During the struggle for the purse the gun discharged and

11

she realized that her husband had been shot. She then ran inside to retrieve a cordless phone and dial 9-1-1, following which she waited for an ambulance and other people to get there.

Defendant's second interview with Deputy Beavers was recorded on micro-cassette. Defendant also signed a consent form to allow Deputy Beavers to search her cell phone and review her text messages, but nothing of evidentiary value was found. When interviewing defendant, Deputy Beavers noted that defendant had a tear in her blouse. Defendant advised Deputy Beavers that while she and the victim argued during their marriage, she did not indicate that there was ever physical violence that warranted medical attention or police intervention. After his interview with defendant, Deputy Beavers drafted an arrest warrant, which was signed by a commissioner. Deputy Beavers did not observe any injuries to defendant while speaking with her at the detective bureau.

On cross-examination, Deputy Beavers testified that, based upon his interview with defendant and other sources of information, he did not believe that the shooting of the victim was accidental. Deputy Beavers testified that his police training was such that he could discharge his weapon if someone tried to gain possession of it.

During re-direct examination, Deputy Beavers clarified that his training was also to point a loaded weapon away from unarmed persons, unless trying to determine whether the person is armed.

David Michael Cox testified as an employee of the Jefferson Parish Sheriff's Office Regional DNA Lab, where he worked as a forensic DNA analyst. He described the process through which DNA is analyzed, and he described his work on the instant case, for which he wrote a DNA report. In connection with this case, he received swabs from the grip and trigger of a Glock 17 pistol, suspected blood from a purse, and reference samples from defendant and the victim. The swabs on the purse came back negative for blood. The swabs from the Glock pistol indicated that there was DNA from at least three individuals. Defendant's DNA was excluded from the DNA mixture while the victim's DNA could not be excluded. Cox described the concept of "transferability" which, with respect to DNA, means that a one person could touch a second person and then an object; the result would be that the second person's DNA could be found on the object.

Allison Murtha testified that she was the manager of the R.J. Lee Group, a materials analysis company, and she was admitted as an expert in the area of gunshot residue analysis. Murtha stated that her company provided a particle extraction on a purse. Both the inside and the outside of the purse were tested for gunshot residue. The report generated from those tests indicated that there was one gunshot residue particle on the inside of the purse and two confirmed gunshot residue particles on the outside of the purse. Murtha explained that if gunshot residue is present on someone's hands, it would be possible for that person to touch another item and transfer the gunshot residue.

On cross-examination, Murtha explained that the gunshot residue on the purse in this case could have come from the purse either being in the proximity

12

when the firearm was discharged or from coming into contact with something that previously contained gunshot residue.

Dr. Dana Troxclair testified that she was a forensic pathologist for the Jefferson Parish Coroner's Office, where she performs autopsies to determine the cause and manner of death. Dr. Troxclair performed an autopsy on the victim on March 5, 2012, and her report indicated that the victim had a single gunshot wound to the left lateral chest area. The gunshot entered through the sixth rib on the left side and penetrated the victim's left lung, his heart, his aorta and his right lung, and then perforated the seventh rib on the right side. There were no exit wounds on the body. There was also a scratch on the body that appeared to have been caused around the time of death. A projectile was recovered from the body. The cause of death was a gunshot wound to the chest and the classification of death was homicide. Dr. Troxclair opined that the victim would not have had time to speak prior to his death. A toxicology was performed on the victim which showed no drugs in his blood or urine, and a .01 alcohol level, which indicated one drink or less.

Dr. Troxclair determined that the gunshot wound was an intermediate range, which means the shot came from a distance between a few inches to two to three feet. In an autopsy photograph of the victim, particles from the gun known as "stippling" can been seen on the body near the wound and on his forearm, where the gunpowder actually burned the skin.

Deputy Christopher Rivers testified that he was the custodian of records for the data compilations of inmate phone calls made from the Jefferson Parish Correctional Center ("JPCC"). In response to a subpoena, Deputy Rivers provided a pin number for defendant, a printed list of phone calls made by defendant, as well as a CD containing the actual phone calls. Deputy Rivers listened to specific calls on those CDs identified by the State, and testified that the CDs accurately reflect the calls maintained on the JPCC system.

On cross-examination, Rivers clarified that the calls were automatically recorded, and that the specific calls were retrieved at the request of the District Attorney's Office.

Sergeant Joel O'Lear testified that he was employed by the Jefferson Parish Sheriff's Office Crime Laboratory where he conducts physical comparisons as a firearms and tool mark examiner. Sergeant O'Lear's office prepared two reports in connection with this case, both were scientific analysis reports. His office was given a Glock pistol, Model 17, 9-millimeter caliber, and a 9-millimeter caliber fired cartridge case to test. O'Lear's office could not match the projectile provided to him to a particular weapon, but concluded that it came from a plume and rifle barrel with the same characteristics as a Glock 17. With respect to the fired cartridge case, O'Lear's office concluded it was fired by the firearm provided to his office for testing. An operability test was performed, during which Sergeant O'Lear attempted to get the firearm to accidentally discharge; every attempt to make the weapon malfunction was unsuccessful.

13

On cross-examination, Sergeant O'Lear stated that it was possible if one's finger was on the gun's trigger guard and the finger slipped onto the trigger during a struggle, that there could be enough force to discharge the firearm.

Major Robert Anthony Donnelly, III, testified that he was academy director and chief instructor of the training division for the Orleans Parish Sheriff's Office. Defendant attended his academy, where she received instruction in firearms. As part of that training, defendant was taught about the "force continuum" which instructs which level of force is appropriate to certain threat levels. Major Donnelly explained that the academy taught gun safety techniques, which included pointing the gun in a safe direction with your finger off the trigger whenever you have a weapon in your hand. Defendant spent five hours a day for a full week training to fire a weapon. Training also included trying to create distance if an individual is trying to go for your weapon.

Defendant was the sole defense witness to testify at trial. She said that she and the victim, Nicholas Houston, started dating seriously in January of 2007 and got married on April 4, 2009. Defendant and Houston lived at 116 Daffodil. She worked at the Orleans Parish Sheriff's Office from November of 2009 until her arrest. Defendant left the family home in November of 2011 following an argument with Houston. She returned to the home through the holidays at the end of the year and left again in January of 2012. She received a Louis Vuitton purse from Houston for her birthday in February of 2012.

On March 4, 2012, defendant was at Harrah's Casino with her friend, Gerard Golden after driving there in the grey BMW. Prior to entering the casino, Golden placed his service weapon in the trunk of defendant's car. After defendant left Harrah's, she and Golden picked up her son, Nicholas Jr., to bring to his father, Houston. Defendant dropped off Golden at a Brothers corner store prior to dropping off Nicholas, Jr. She arrived at the house on Daffodil and parked in the driveway. Defendant testified that shortly after arriving, Houston met her in the hallway and asked her why she had not been answering her phone. She claimed that when she tried to leave in her vehicle that he took her phone and keys out of the ignition before going back inside the house. Defendant stated that Houston attempted to unlock her phone but that she would not give him her password, following which he pushed her, tore her clothes and attempted to choke her while in the bedroom. Houston broke the cordless phone after defendant said she would call police. Defendant ran from the house to the corner of Daffodil and Buttercup. Defendant said that Houston asked her if she wanted to leave, to which she replied that she did. Houston then told defendant that if she wanted to leave that she would have to take her car. The two proceeded to the house and agreed to exchange items from one car to another. Defendant did not see any children from the neighborhood close by. She reached inside of the backseat of the BMW to retrieve her purse, then went to the trunk of the same car and removed Golden's gun. Houston was standing between the two cars, retrieving items from a 1998 Mirage, defendant's car. Defendant said that she had her entire hand wrapped around the grip of the gun and did not have any fingers on the trigger guard. The purse was in her left hand and

14

the gun was in her right hand. Defendant attempted to get into her car through the driver's side but the door was locked, so she attempted to enter through the passenger side. She denied waving the gun or threatening Houston while walking around the back of the car. Defendant said that when she walked between the cars, Houston told her that he wanted her to give the purse back, but she refused because her valuables were in there. The two grabbed the purse back and forth, and defendant believed that she was being overpowered. Defendant tried to get a better grip on the purse at which time the gun went off. She said that she could have pulled the trigger. Houston had his hand on the gun at the time it discharged. He told defendant that he had been shot and then fell to the ground. Defendant denied intentionally shooting Houston and claimed she acted in self-defense. She called 9-1-1 when Houston stopped breathing. Defendant brought the gun into the house and ejected the slide on her gun, then returned it to her purse which she then placed on the hood of her car. She testified that the only statement she made to Deputy Bradley was that she and Houston were "tussling over the purse, and the gun went off." Deputy Bradley asked defendant to sit in the back of the police car. She was not handcuffed and had her cell phone, which she used to call Houston's aunt. Defendant was transported from Daffodil to the Detective Bureau, where she gave a statement to Detective Beavers. She was incarcerated in Jefferson Parish and placed in solitary confinement for her own protection due to her status as a criminal sheriff's deputy in Orleans. She spoke on the phone to Gerard every day, and he was assisting her in contacting her family and attorneys.

  An attorney, Lon Burns, went to visit defendant in jail the day after she was arrested. Burns explained to defendant the crimes of negligent homicide and second degree murder, and told her that she needed to "show remorse." Burns further explained that he had a client who did not show remorse and received a life sentence in prison. Defendant said that the recording of her discussion that negligent homicide was a better outcome than manslaughter or second degree murder was because of what Burns had told her. She said that she did not intentionally try to kill Houston and did not want him to die that day.

  On cross-examination, defendant denied being in a relationship with Gerard Golden at the time she shot Houston. Defendant did not tell police that Houston had tried to choke her prior to the shooting. Defendant did not disagree that the children witnessed a verbal altercation and saw defendant taking a gun out of her trunk, but she denied that Houston accused her of cheating on him while the two were in the driveway. She denied waving the gun at Houston. Defendant was also unsure of the angle of the gun when it discharged. She did not report the shooting to 9-1-1 as an accident. Defendant denied giving a statement that indicated she got her purse from her car after the shooting occurred, and testified that any such statement would have been a mistake on her part.[21]

---

[21] State v. Estes, 168 So. 3d 847, 850-56 (La. App. 5th Cir. 2015); State Rec., Vol. 7 of 8.

15

The United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

In the instant case, there was ample evidence of petitioner's guilt introduced at trial, and she has presented no new evidence whatsoever to show that she is actually innocent. Therefore, she cannot meet "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt.'" Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, Perkins does not aid her.

Because petitioner is not entitled to statutory tolling, and because she has not established that she is eligible for equitable tolling or that she is actually innocent, her federal application for habeas corpus relief had to be filed no later than **March 28, 2016**, in order to be timely. Her application was not filed until **March 3, 2019**, and, therefore, it is untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** the federal application seeking federal habeas corpus relief filed by Honore N. Estes be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[22]

New Orleans, Louisiana, this __6th__ day of March, 2020.

*[signature]*
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[22] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.